### · WATTERS & SON *v.* RETAIL CLERKS UNION NO. 479
### *et al.*

1. The publication stated the facts·and reasons why the defendants placed the plaintiffs on the "unfair list," and, taken as a whole, cast no imputation upon their character as individuals, or upon their solvency or standing as merchants.

2. The words were not actionable per se, and the petition set out no cause of action, failing as it did to allege any special damage or loss of custom, trade, or profits, or any injury of any sort, to plaintiffs' business.

Argued May 26, — Decided June 9, 1904.

Action for libel.   Before Judge Henry.   Floyd superior court. January 26, 1904.

The action was by the firm of J. B. Watters & Son against the Retail Clerks Union No. 479, the Central Labor Union, and others. From the petition it appeared, that in May, 1903, there was published in a newspaper of Rome, Georgia, a communication as follows: "For some years past it has been the custom of leading merchants of this city to close their various places of business at 6 o'clock p. m. during the hot summer months.   They have done this believing that it was to the mutual interest of themselves and their clerks, and that both they and their employees deserve the small amount of rest and recreation that this movement enables them to have.   As usual this movement was started this spring, and was, with one exception, agreed to by all the fair-

minded and leading merchants; the firm of J. B. Watters & Son alone refusing to sign the agreement, although every means was resorted to to get them to fall into line and make it unanimous. After they had been approached by a committee from the Central Labor Union and the Clerks Union and refused to enter into the closing movement, they were put on the unfair list by the local Clerks Union, which action was immediately sanctioned by the Central Labor Union; and feeling that we have done everything that was fair and reasonable, we now ask the support of our friends and the public generally in the action that has been taken. We believe that the people of Rome are too broad-minded to patronize or endorse any firm in its efforts to hinder a movement that would give a short period of rest to several hundred working people, both men and women, during the hot months.　The following merchants are fair and broad-minded in their attitude towards the laboring people of Rome, and we ask you to patronize them when possible.　They have all agreed to the early closing movement, and, beginning May 15th, will close their business houses at 6 p. m. [Here followed a list of names.]　Respectfully submitted, Clerks Union No. 479, Central Labor Union." Handbills were published, requesting union men and their sympathizers to withhold their patronage from the firm of J. B. Watters & Son, as they were still on the unfair list of the Retail Clerks Union. The petition alleged that the defendants conspired together and agreed to publish these communications; that the statement that the plaintiffs had refused to enter into the closing movement was untrue; that they agreed to close if all the merchants in their line did the same; that the publications were false and malicious and were made for the purpose of intimidating the plaintiffs and forcing them to sign an agreement relative to the conduct of their business, contrary to their free will, and for the purpose of damaging their reputation and exposing them to public hatred and ridicule, and were so understood by those who read the same; and that by reason of these facts the plaintiffs were damaged in the sum of $25,000.　The defendants demurred on several grounds, all of which were overruled except one, which was, that " none of the communications set forth in the petition are actionable per se; nor are they in any manner or form libelous."　The court sustained this ground and dismissed the petition, and the plaintiffs excepted.

*Dean & Dean*, for plaintiffs, cited *Ga. R.* 76/280; 77/242; 86/551, 557; 93/633; 100/213; 108/414; 109/433; 111/419; 118/820; 10 Ohio Dec. 453, 21 Wkly. Law Bul. 223; 13 Am. & Eng. Enc. L. (1st ed.) 314; 18 Id. (2d ed.) 87, 863, 942, 948, 967; Newell on Slander and Libel (2d ed.) 181, § 14; Townshend on Slander and Libel, § 188.

*McHenry & Maddox*, for defendants, cited Civil Code, § 3832; *Ga. R.* 116/655; 111/418; 96/396; 93/633; 49 Am. R. 666; 48 Am. R. 632; 4 Am. D. 626; 13 Am. & Eng. Enc. L. (1st ed.) 432, par. 12; 18 Id. (2d ed.) 942, 954–5.

LAMAR, J.    Where it is necessary to allege special damages in order to set out a cause of action, the particular loss or injury must be distinctly stated, the ad damnum clause, that the plaintiff had been damaged $25,000, not being the equivalent of such an averment.    Pollard *v.* Lyon, 91 U. S. 225.    In view of this well-recognized rule, and the assignment of error on the judge's order, the present case does not raise any question as to defendants' liability for a conspiracy.    *Brown* v. *Jacobs Co.*, 115 *Ga.* 433; 3 Joyce on Damages, § 2231.    Even after a special demurrer calling attention to the omission, there was no amendment.    The petition set out no loss of trade, profits, or customers; no decreased ability to buy or sell; no violence ; no intimidation of patrons; no interference with plaintiff's business, and no injury of any sort, except the general damage alleged to flow from the use of the words claimed to be libelous per se.    In fact the plaintiffs treat this solely as an action for libel, and claim in their brief that "the record presents but two questions for determination: first, are the publications libelous; second, are they actionable per se ?"    In cases of this sort the publication or conversation must be construed as a whole, and in the sense in which it is evident the language was intended to be used.    Under this rule words ordinarily harmless may from the context convey such a meaning as to give ground for an action.    On the other hand, words which are sometimes actionable may, when taken in connection with the entire article, be deprived of their usual sting and afford no ground for a recovery.    So the word "unfair" may sometimes mean "dishonest," and, when by a colloquium or innuendo shown to have this meaning, might give rise to a cause of action.    But it does not

necessarily involve so serious a charge.     It may convey the idea of "discrimination."     It may mean that one is "prejudiced" or "partial."     It may mean "illiberal," "hard," "ungenerous," or "exacting."     But whatever the sense in which it may on occasions be used, it is perfectly evident that in the present case it imputed nothing involving moral turpitude to the firm or to the individuals composing it, and cast no imputation upon their credit, solvency, or conduct as merchants.     Reading the publication as a whole, there was no suggestion of the use of short weights or measures, no accusation of fraud, deceit, or misrepresentation in the sale or purchase of goods.     Nor did it charge anything against the honesty, integrity, solvency, or credit of the partnership.     A state of facts was given.     The words "unfair" and "unfair list" were coupled with these facts, and amounted to a characterization or statement of what defendants thought of plaintiffs' refusal to become a party to the early closing movement.     Any one reading the communication must have seen that the plaintiffs were not charged with overstepping their rights or doing anything unlawful.     It was in principle analogous to a somewhat similar publication concerning a merchant who refused to contribute to a fund for keeping the streets sprinkled.     People v. Jerome, 1 Mich. 142. A case even more in point was that of Donnaghue v. Gaffy, 53 Conn. 43, where the defendant published that because he had quit buying from plaintiffs they privately overbid him and by "base treachery" secured the property which he had leased, and ordered him immediately to vacate.     After stating these facts, the defendant in the article alleged to be libelous added:     "The firm is not worthy of our support, being guilty of foul and *unfair* dealings to 'get square,' as they say, with one who exercises the right to trade where he likes; and I , . request those who believe in the fair thing as between man and man to give their support to some other house."     It was there held (citing Homer v. Englehardt, 117 Mass. 539) that the words were not actionable per se, the whole publication showing that the transaction was perfectly lawful; and that, in the absence of an allegation of some special damage, the court could not legally presume that the plaintiffs were degraded in the estimation of the public, or that they suffered loss of character, profits, or business.     See also Railroad v. Delany, 102 Tenn. 289, where an employee sued for general damages alleged to have

resulted from a false publication that he had gone on a strike. The blacklisting cases, like that of *White* v. *Parks*, 93 *Ga.* 633, cited for the plaintiffs, do not apply, because there the words were actionable per se, as they tended to lessen the plaintiff's credit, charging as they did that he was a delinquent debtor, guilty of dishonest and fraudulent methods. Here the publication was not per se libelous, and no special damages are set out. The judgment sustaining the demurrer is

*Affirmed. All the Justices concur, except.Evans, J., disqualified.*